**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MELANIE HOWARD MUSIC, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:08-0979** |
| | ) | **Judge Trauger** |
| **WARNER BROS. RECORDS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

Pending before the court is a Motion to Dismiss (Docket No. 22) and a Motion for

Summary Judgment (Docket No. 52) filed by the defendant, Warner Bros. Records, Inc. (WBR),

and a Request for Summary Judgment *Sua Sponte* (Docket No. 51) filed by the plaintiff, Melanie

Howard Music, Inc. (MHM), which the court interprets as a Motion for Summary Judgment.

The arguments advanced by both sides in the Motion to Dismiss briefing have been subsumed

and expanded upon in the summary judgment briefing and, therefore, as a practical matter,

pending before the court are cross-motions for summary judgment.[1]  The plaintiff's motion will

be denied, and the defendant's motion will be granted in part and denied in part.

**FACTUAL AND PROCEDURAL BACKGROUND**

This is a copyright/royalty dispute between the plaintiff, a Nashville, Tennessee-based

---

[1]WBR's summary judgment motion requested oral argument on these issues.  (Docket
No. 52 at 1.)  In a telephone conference on November 4, 2009, the parties were apprised that a
decision on the pending motions would be issued in short order and there was no request, at that
time, for oral argument.  The court denies the request for oral argument on these issues.

1

music publisher, and the defendant, a New York-based corporation that is involved in many aspects of the entertainment industry.[2] Lori McKenna is a Boston-based songwriter who worked closely with Melanie Howard (director of MHM) and whose albums, *Bittertown* and *Unglamorous*, are at the heart of this dispute.

On or about December 1, 2004, McKenna entered into an exclusive songwriting agreement (ESA) with MHM. The ESA grants MHM rights in McKenna's songs, but those rights are defined differently (in Sections 3 and 4 of the ESA, respectively) based on when the song was written and acquired. For songs that were to be written during the term of the ESA, McKenna granted MHM "100% of [her] interest in all musical compositions and related works and materials . . . together with all copyrights therein . . . and all administration rights." (Docket No. 28 Ex. 1 at 1.) For a song that had been previously written and recorded, the ESA calls for MHM to receive 50 percent of McKenna's interest in that song upon MHM's obtaining a "new recording" of that song. (*Id.* at 2.) The agreement also provides that MHM will have the "100% . . . right to administer" these "co-published songs." (*Id.*) It is undisputed that the songs on *Bittertown* were written prior to the ESA and that the songs on *Unglamorous* were written during the term of the ESA.

Effective August 30, 2005, McKenna entered into a Recording Agreement with WBR. It is undisputed that the Agreement was primarily negotiated by counsel for McKenna (Gary Gilbert

---

[2]Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 49, 54, 57, 61, 67, 68, 70 and 76) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

2

and his associate Scott Bradford) and counsel for WBR (Susan Genco and Charles Hamilton). Under this Agreement, WBR purchased thirteen songs, embodied on the *Bittertown* album, which, as indicated above, was an album that had been previously released by an independent record label.

There is ample dispute about the degree to which Melanie Howard, in her role as publisher and confidant of McKenna, was involved in the negotiations regarding the Recording Agreement. The defendant points out that, during the course of these negotiations, McKenna was not represented by a manager, and, therefore, Howard was a natural person to assist McKenna in the Recording Agreement negotiations. WBR also relies on the deposition testimony of McKenna's attorney at the time, Gary Gilbert, for the proposition that Howard was a liaison between himself and McKenna and that Howard reviewed and approved each draft of the Agreement. (Docket No. 65 Ex. 2 at 14.)

Howard disputes this version of events, specifically rejecting Gilbert's testimony that she "approved every draft." (Docket No. 65 Ex. 4 at 17.) Rather, she claims that, while she assisted McKenna with issues such as securing artwork for the album and had discussions with Gilbert about the Recording Agreement, she had little substantive role in the Recording Agreement negotiation process. (*See id.* at 17-18.) Specifically, while she admits to having seen one draft of the Recording Agreement at one point, she claims that she did not negotiate the Agreement, had little significant contact with the principals who were negotiating the contract, and that she was unaware of certain terms, including a provision known as the "Controlled Composition Clause (CCC)," which has become the subject of controversy in this dispute. (Docket No. 50 at 2.) For purposes of this dispute, it suffices to say that the CCC capped, at eleven songs per compilation,

the statutory royalties that the owner of the songs could receive on McKenna compilations. (*Id.*) Therefore, for a McKenna album of 15 songs, the owner would receive the same royalties as if the McKenna album had 11 songs. (*Id.*) Howard claims that she did not believe the CCC was going to be in the final Recording Agreement.[3] (*Id.* at 3.)

Further complicating matters, the plaintiff also contends that, while the Effective Date of the Recording Agreement is August 30, 2005, the Agreement was backdated, that is, it was actually signed in November of 2005. WBR does not dispute that the final terms of the Agreement were ironed out as late as November 2005 but states that industry practice was to date recording agreements from the date of the first draft, on the assumption that the deal would be completed. Therefore, WBR contends, the August 30 date is the date that reflects the agreement of the parties.

On September 27, 2005, WBR released *Bittertown.* WBR concedes that it did not have licenses from MHM to release the songs on the album, but, WBR contends, the license from McKenna (embodied in the Recording Agreement) was sufficient to permissibly release the songs. Two days later, on September 29, McKenna and MHM entered into an Amendment to the ESA, which established that the *Bittertown* songs fell within the purview of Section 4 of the ESA (the "new recordings" provision) and, therefore, MHM was entitled to 50 percent ownership and the "right to administer" those songs. (Docket No. 28 Ex. 1 at 16.)

---

[3] The parties do not dispute that, at one point in the negotiations, Hamilton (counsel for WBR) became aware that McKenna's side (including Howard) was objecting to the CCC. (Docket No. 76 at 6-7.) The parties also agree that, through the negotiation process, the primary negotiators agreed to the CCC in exchange for other concessions, although no one from WBR's side ever explicitly informed Howard that the CCC would remain in the Recording Agreement. (*Id.*)

4

Trouble between the parties began to brew in mid-2007. At that time, McKenna was preparing to release a second album, *Unglamorous*, through WBR, with assistance from MHM. In conjunction with preparing for that release, individuals at MHM (specifically Alisa Moore, who began working with Howard at MHM beginning in 2006) observed that WBR had not paid MHM licensing fees for the *Bittertown* album. Initially, WBR recognized MHM's position that WBR had not obtained a license for the *Bittertown* songs but then quickly changed its position and stated that its use of the *Bittertown* songs was authorized under the Recording Agreement with McKenna. These initial discussions started a roughly ten-month period of sporadic negotiation regarding the licensing of *Bittertown* and *Unglamorous*. These negotiations were primarily conducted via e-mail, with input from representatives at various levels of both organizations.

The parties have filed a plethora of e-mails from the June 2007 through April 2008 time period, during which the parties, somewhat sporadically, attempted to negotiate a resolution to the licensing issues surrounding *Bittertown* and *Unglamorous*. It is clear that, initially, MHM did not view WBR's failure to pay license fees for *Bittertown* as copyright infringement, but, rather, as Moore put it in her deposition, as an "oversight" by WBR, and, in fact, MHM initially offered to issue licenses to WBR for *Bittertown*. (Docket No. 65 Ex. 3 at 16.) The e-mails and Moore's deposition testimony also show that Moore, over a period of months, repeatedly pushed for money from WBR for having used the *Unglamorous* and *Bittertown* songs, but her efforts were frequently rebuffed or ignored. (*Id.* at 50-51.)

From these e-mails and from the Statements of Facts, it is clear that, after the parties had an opportunity to research the situation and then to "dig in their heels," WBR's position was that

5

McKenna's rights in at least some of these songs were not controlled by MHM, and it was MHM's position that the ESA granted MHM the right to control the distribution and licensing of all of the songs. These negotiations were complicated by the fact that there were significant time pressures in regards to promoting and releasing McKenna's second album; that is, those interested in the commercial success of *Unglamorous* were less concerned with the licensing and royalty dispute than with ensuring that a proper promotional foundation for the album was laid prior to its release. (*See e.g.* Docket No. 65 Ex. 73.)

One additional complicating factor, as indicated above, was that the parties disputed the royalty rate at which any license fees should be paid on the songs. (Docket No. 65 Ex. 3 at 50-51.) According to WBR, the CCC in the Recording Agreement limited the license fees to the statutory rate for eleven songs per album, but MHM, arguing that it was not a party to the Recording Agreement and was not bound by it, claimed that the license fees should correspond to the actual number of songs on the album. On *Bittertown,* at least, the number of songs on the album exceeded eleven.[4] Therefore, in addition to the confusion about whether MHM or McKenna controlled the songs, there was the dispute about how much whoever controlled the songs should be compensated.

On August 14, 2007, WBR released *Unglamorous*. There is no dispute that WBR did not have a written license from MHM to release these songs. It is true, however, that, in the course of the negotiations discussed above, MHM authorized WBR to exploit *Unglamorous* at various promotional events ahead of the album's release. It is also undisputed that WBR obtained valid

---

[4] The CCC issue was less of a concern for *Unglamorous* because there are not more than 11 songs on that album. (Docket No. 65 Ex. 3 at 126.)

licenses for five of the *Unglamorous* songs from co-writers/co-owners (individuals otherwise not connected to this litigation) of those songs. WBR also timely submitted royalty payments to MHM for *Unglamorous* songs, although MHM contends that these royalty payments were incomplete and not permissible in the first place without a valid license.

The sporadic negotiations between WBR and MHM apparently broke off in April 2008, with no resolution as to the licensing issues. WBR continued to submit royalty payments to MHM for *Unglamorous* sales, and, in February 2009, four months after this litigation was commenced, WBR sent MHM a royalty check for various *Bittertown* uses. It is also undisputed that MHM knew that WBR was exploiting the songs on both albums and that MHM never explicitly requested or demanded that WBR stop exploiting these songs, although, in one April 2008 e-mail, a MHM representative did note that, unless the parties resolved the dispute, a copyright infringement claim was developing. (Docket No. 48 Ex. 15 at 3.)

## ANALYSIS

The plaintiff claims that the defendant infringed on the copyrights that it holds in the songs on the albums *Bittertown* and *Unglamorous* because WBR distributed and sold these songs without obtaining a license to do so from the plaintiff. The defendant claims that it obtained a valid license from McKenna to exploit the *Bittertown* recordings and a valid license from five co-authors to exploit five of the songs on *Unglamorous*. As to all of the recordings at issue (including the remaining *Unglamorous* songs for which no written license was obtained), the defendant also contends that it had an implied license to distribute the songs. Both parties have moved for summary judgment.

## I.    Summary Judgment Standard

7

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac*

*Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II.     Copyright Infringement

As indicated above, the plaintiff's entire Complaint is premised on copyright infringement. The elements of a copyright-infringement claim are (1) ownership of the copyright by the plaintiff and (2) copying by the defendant. *Zomba Enters., Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 581 (6th Cir. 2007). The defendant claims that its use of all of the recordings on the *Bittertown* and *Unglamorous* albums is justified on an implied license theory. Additionally, the defendant contends that it had a valid license from McKenna to use the *Bittertown* songs and a valid license from other co-writers to use five of the *Unglamorous* songs.

### A.     Implied License

WBR contends that the theory of "implied license" permits its use, as a matter of law, of all of the songs on the *Bittertown* and *Unglamorous* albums. (*See e.g.* Docket No. 53 at 11.) The plaintiff, on the other hand, contends that, as a matter of law, there can be no implied license found here, and, therefore, WBR's use of the recordings at issue cannot be excused on this theory. (Docket No. 51 at 17.) Significant disputed issues of fact remain such that neither side is entitled to summary judgment on this issue.

An "implied license" is an unwritten license to use a work that the court infers from the

circumstances and from the conduct between the parties. *See Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 398-99 (6th Cir. 2007). Indeed, "[c]ourts have held that the existence of an implied license to use the copyright for a particular purpose precludes a finding of infringement" and such a "non-exclusive license . . . is not . . . subject to [a] writing requirement" and "may be implied from conduct." *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998)(internal quotation omitted).

There is no precise formula for determining whether an implied license exists, but, rather, the court is to examine the "intent" of the parties from the "totality of the circumstances." *Jeffrey A. Grusenmeyer & Associates, Inc. v. Davison, Smith & Certo Architects, Inc.*, 212 Fed. Appx. 510, 514 (6th Cir. 2007). That is, the court should explore, based on the facts and the circumstances of the individual case, whether the evidence supports the notion that the parties, in essence, made an agreement permitting the defendant to use the work, consistent with certain understandings or terms. *Johnson*, 149 F.3d at 500-02. The key issue, again, is intent, and the key question is whether the facts and the circumstances demonstrate that "the copyright owners intended that their copyrighted works be used in the manner in which they were eventually used." *Id.* at 502. Generally, the party claiming the existence of an implied license has the burden of proving the license. *See Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2nd Cir. 1995).

The defendant relies on several facts in support of its argument that, based on a theory of implied license, "no reasonable juror could find WBR's actions in exploiting the compositions embodied on the *Bittertown* and *Unglamorous* albums to constitute copyright infringement." (Docket No. 53 at 12.) First, discussing *Bittertown*, WBR argues that Howard, who directs and manages MHM, was an "active participant" in the 2005 Recording Agreement negotiations, and,

10

therefore, she understood the "legal effect" of the provisions in that Agreement as to both licensing and compensation. (*Id.* at 12-13.) WBR points to e-mails that indicate that Howard reviewed mark-ups and drafts of the Recording Agreement and that she took an active role in preparing *Bittertown* for release. (*Id.*) WBR also notes that, for two years, MHM tacitly allowed WBR to use *Bittertown* without a license, and, then, when Moore noticed the absence of licensing, Moore did not claim copyright infringement but, instead, offered to issue licenses for the *Bittertown* tracks. (*Id.*)

As to *Unglamorous*, WBR points out that (1) MHM did not object to its release, even though it knew no formal license had been issued; (2) MHM explicitly authorized WBR to undertake various promotional and marketing efforts that exploited the songs on *Unglamorous*; (3) MHM never demanded WBR cease exploiting *Unglamorous*, and (4) WBR paid royalties to MHM for *Unglamorous*, which MHM accepted. (*Id* at 14-17.)

In response, MHM contends that there was never any agreement, implied or otherwise, to license these songs. First, MHM reiterates its position that Howard was not intimately involved in the Recording Agreement negotiations and that she had no idea that the CCC was in the final agreement, a point MHM emphasizes by pointing out that no one on the WBR side can recall speaking to Howard about any of the provisions in the agreement. (Docket No. 60 at 10-12.) MHM also points to the months of negotiations (from June 2007 to April 2008) contained in the e-mails discussed above, in which Moore repeatedly sought to issue a license to, and obtain money from, WBR but was never successful. (Docket No. 51 at 17.) MHM argues that WBR's negotiation with MHM was "sporadic and inconsistent" and that any "careless" attempts that WBR made to license these recordings were only made in response to Moore's pressing the issue.

(*Id.* at 18.)  Even in these "careless" efforts, MHM claims, WBR attempted to dictate terms, such as the CCC, all while also arguing that MHM did not even control many, if not all, of the songs at issue.  (*Id.;* Docket No. 60 at 15. )

Moreover, MHM argues that, while it may have authorized certain promotional uses of the *Unglamorous* songs, that should not be interpreted as indicating that MHM authorized the general commercial release of the songs.  (Docket No. 51 at 20.)  Also, while MHM concedes that WBR eventually paid royalties on both *Bittertown* and *Unglamorous,* MHM argues that these royalties were late, incomplete and not properly accounted for.  That is, the royalties amount to another attempt by the defendant, as a large and powerful corporation, to impose terms and conditions upon the plaintiff, even though licensing terms were never agreed to.  (Docket No. 60 at 17-18.) In essence, MHM argues that WBR's claims of an implied license are inconsistent with the stance taken by WBR over the months of negotiation, which indicates that there was never an agreement between the parties as to the licensing of these songs and, therefore, the court should find that there was no implied license as a matter of law.  (*Id.* at 9.)

It is the court's view that, on this evidence, a reasonable jury could find either way on the implied license issue.  Again, the issue is whether the parties intended to enter into some sort of an agreement whereby they agreed that WBR could use the songs at issue.  From WBR's perspective, the entire dispute can be reasonably viewed on the following timeline: (1) at various points, WBR obtained tacit consent from MHM to exploit the *Bittertown* and *Unglamorous* songs; (2) the license/royalty issues were complex and, to some extent, fell through the cracks; (3) WBR attempted to resolve those issues, finally doing so by sending, somewhat tardy to be sure, license fees to MHM, which MHM promptly deposited.  WBR can argue that, taking a broad

12

view of the entire dispute, the parties' conduct was entirely consistent with the existence of a license, in that WBR used the songs and (eventually) paid for them, and MHM knew the songs were being exploited and never informed WBR that it could not exploit the songs.

However, a reasonable jury could also side with MHM's position that a license cannot be implied from the conduct of the parties here. That is, there are numerous e-mails in which Moore pushes for license fees to be paid, apparently with no response or agreement from WBR, and these e-mails suggest that this dispute continued for months without Moore's being able to obtain a satisfactory response from WBR. (*See e.g.* Docket No. 65 Ex. 64-68, 76, 83.) These e-mails, along with Moore's deposition testimony, strongly suggest that the parties never finally agreed on any particular licensing terms, and, therefore, the royalty payments from WBR were something of a unilateral attempt by WBR to make this conflict go away, rather than being an effort to pay off an agreed-upon amount. Moreover, the e-mails from Moore also strongly suggest that Moore agreed, on behalf of MHM, to allow WBR to exploit the *Unglamorous* materials for promotional purposes only because it would benefit McKenna. That is, there is no suggestion in the e-mails that the agreement to exploit these materials for promotional purposes was indicative of any broader agreement to commercially license the songs. (*See e.g.* Docket No. 65 Ex. 80-81.)

Adding to the confusion is the continuing uncertainty as to Howard's role in the process and her understanding of the legal effect of the Recording Agreement, a matter which the principals in this dispute still hotly debate. In short, both sides have advanced more than a "scintilla" of evidence in support of their position on the implied license issue, and, therefore, the court cannot say, as a matter of law, that there was or was not an implied license here. This is a

13

matter for the jury.[5]

### B.    Explicit Co-Author License

As noted above, WBR also contends that it did receive explicit written licenses to exploit some of the songs at issue in this case.  Specifically, WBR claims that it received licenses from co-writers and owners of various songs, and, therefore, it could not have infringed on the copyrights to those songs.

It is well-settled that, generally, joint copyright owners are deemed "tenants in common," with each owning an undivided interest in the entire copyright, and that each owner is entitled to all of the exclusive rights held by copyright owners, including the right to issue non-exclusive licenses of the work.  *Chirco v. Gateway Oaks, LLC*, 2005 WL 2284218, *5-6 (E.D. Mich. Aug 26, 2005)(citing, among others, *Nimmer on Copyright* § 6.09-6.10).  Therefore, "a license from a co-owner of a copyrighted work is a defense to a claim of copyright infringement brought by any other co-owner."  *Bridgeport Music, Inc. v. DJ Yella Muzick*, 99 Fed. Appx. 686, 691 (6th Cir. 2004).  That is, "a joint owner of a copyright . . . may grant licenses to a jointly-owned work without the consent of the other joint owners," and the licensee may exploit that work, therefore, without the explicit permission of other co-owners of the work, although the licensor may be

---

[5] WBR also contends that the court should grant summary judgment for WBR on an equitable estoppel theory.  (Docket No. 53 at 18.)  To establish a claim of equitable estoppel, the defendant must show, among other things, that the plaintiff knew of the infringement yet acted in a way that reasonably misled the defendant to believe that the infringement was permissible or excused.  *See Chi Boy Music v. Charlie Club Inc.*, 930 F.2d 1224, 1228 (7th Cir. 1991)("for estoppel to apply in a copyright action, the copyright owner must be aware of the infringing conduct and yet act in a way that induces the infringer reasonably to rely upon such action to his detriment.")  WBR is not entitled to judgment as a matter of law on an equitable estoppel theory because, as indicated above, a reasonable jury could conclude that MHM, particularly through the Moore e-mails, had not induced WBR into believing that it could continue to infringe.

14

required to account to the other co-owners of the copyright. *Thompson v. Looney's Tavern Productions, Inc.*, 204 Fed. Appx. 844, 850 (11th Cir. 2006); *Bridgeport Music Inc. v. Dimension Films*, 230 F. Supp. 2d 830, 835 (M.D. Tenn. 2002)(Higgins, J); *Geshwind v. Garrick*, 734 F. Supp. 644, 651 (S.D.N.Y. 1990) ("a joint owner of a work does not need the permission of his joint owner to use or license the work, and neither he nor a party to whom he gives permission to use the work can be held liable to the other owner for infringement.")

WBR's co-author license argument is based on two independent premises. One, WBR contends that it received licenses from the co-writers and co-owners (individuals otherwise not involved in this case) of five songs on *Unglamorous*, that is, "Unglamorous," "How To Survive," "Drinking Problem," "Leaving This Life," and "Confetti." (Docket No. 64 at 11.) Two, WBR claims that McKenna was an owner of the copyrights on the *Bittertown* album, and, through the Recording Agreement, she permissibly licensed the songs on the *Bittertown* album to WBR. The court will consider each argument in turn.

### 1. The five *Unglamorous* songs

WBR is clearly entitled to summary judgment on the plaintiff's infringement claim as to these five songs. In both Moore's Rule 30(b)(6) deposition and in the Statement of Facts, MHM did not contest that WBR had obtained valid licenses for the use of these five songs from assorted co-authors/co-owners of those songs. (See Docket No. 74 at 10; Docket No. 57 at 4; Docket No. 65 Ex. 3 at 61.)

In its Response to WBR's Motion for Summary Judgment, MHM does not challenge the law above or its previous concessions but rather contends that "all of the licenses obtained by WBR contained language limiting the license to the publisher's share of the composition."

15

(Docket No. 60 at 6.) MHM then goes on to cite language from each license that it claims is somehow limiting. (*Id.*) At most, there is language in some of these licenses that indicates that the use is limited to the "publisher's share" of the recording or that the license should not be deemed to be a license from any other co-authors. (*Id.*)

That said, MHM has come forward with no law or basis for concluding that this language affects the validity of the defendant's use as far as the plaintiff's copyright infringement action is concerned. That is, the law discussed above is clear: a license from a co-owner of a work precludes a copyright infringement action against the licensee by another co-owner. *Siegel v. Warner Bros. Entertainment, Inc.*, 542 F. Supp. 2d 1098, 1143 (C.D. Cal. 2008)("licensees . . . are accountable only to their licensors, and owe no duty of accounting to the non-licensor co-owner of a copyright the licensee exploits.") As WBR indisputably obtained valid licenses for these five songs, it is entitled to summary judgment on the plaintiff's copyright infringement action as to these five songs. Therefore, the plaintiff's infringement action as to these five songs will be dismissed.

### 2. The *Bittertown* songs

The remaining issue is whether WBR obtained a valid license from McKenna (as co-owner or owner) to exploit the *Bittertown* songs. WBR contends that McKenna not only wrote the songs at issue, but that she expressly retained ownership (and licensing) rights in those songs throughout the course of this dispute. Indeed, in the September 29, 2005 Amendment to the ESA, McKenna and MHM agreed that "*as of this date* [MHM] is herein assigned/transferred one half *of my ownership* in songs embodied on the Warner Bros. album entitled 'Bittertown.'" (Docket No. 28 Ex. 1 at 16.)(emphasis added). Therefore, under the plain language of the Amendment that

16

MHM signed, the parties acknowledged that McKenna had ownership rights in these songs that pre-dated and continued through the signing of this Amendment. Using these rights, WBR claims, McKenna granted an express license to WBR to exploit the *Bittertown* songs through the August 30, 2005 Recording Agreement.[6] (Docket No. 53 at 6.)

In response, the plaintiff argues that McKenna lacked authorization to license the *Bittertown* songs because of the ESA, which, MHM argues, provides MHM with 100 percent of the administration rights over McKenna's song collection, including *Bittertown*.[7] (Docket No. 51 at 1.) The plaintiff relies heavily on a treatise titled *Kohn on Music Licensing* for the notion that "'administration rights' is the term used to define who among the copyright owners, or co-publishers, has the authority to grant licenses for the use of the music." (Docket No. 51 at 14

---

[6] The court must briefly address the "backdating" issue mentioned in the factual discussion. There is no dispute that, while the Effective Date of the Recording Agreement is August 30, 2005, the details of the Recording Agreement were still being ironed out as late as November 2005. As indicated above, the plaintiff contends that this means that the Recording Agreement was "backdated." Not only has Howard, in her affidavit, recognized August 30, 2005 as the Effective Date of the Agreement (Docket No. 50 at 2), but the plaintiff has come forward with no authority explaining why the effective date for the Recording Agreement *as agreed by McKenna and WBR* should not be enforced. Nor has MHM come forward with any evidence that the Recording Agreement was "backdated" in order to trample on the rights of MHM. WBR, on the other hand, has come forward with evidence that the Recording Agreement was dated in accordance with standard industry practice, that is, the Effective Date is the date of the first draft of the agreement. (Docket No. 65 Ex. 1 at 46-47.) Moreover, a September 6, 2005 e-mail from Howard to a senior representative at WBR forwards a press release hailing the signing of the Recording Agreement. (Docket No. 75 Ex. A.) Therefore, absent any authority to the contrary, the court will view the Recording Agreement has having been entered into on August 30, 2005.

[7] MHM also argues that the Recording Agreement "did not contain any specifics as to the songs, accounting terms, or duration that would normally be found in" such a license. (Docket No. 51 at 13.) The issue, though, is whether McKenna had the right to license the songs at issue, not whether MHM feels that the license that McKenna issued was appropriate under the circumstances.

17

citing Al Kohn & Bon Kohn, *Kohn on Music Licensing* 252 (3rd Ed. 2002)).  The plaintiff, again

relying on *Kohn,* discusses that it is not uncommon, where there are several co-owners of a

musical composition, for those co-owners to agree to an exclusive administration agreement,

whereby one co-owner is appointed "exclusive adminstrator" with sole authority to license the

work at issue.  (*Id.*)

The plaintiff also notes that, while, as addressed above, each respective co-owner of a work

has the legal right to grant a license without the co-owners' consent, the court may find an

exception to that rule in the rare circumstance where there is an agreement between the co-owners

that explicitly excludes such licensing.  *See Bridgeport Music*, 230 F. Supp. 2d at 835.  Indeed, as

the defendant concedes, "an agreement between joint owners that no one of them shall have the

right to license the work without the consent of the others will be binding on the parties to the

agreement."  (Docket No. 53 at 10; *see also Glovaroma, Inc. v. Maljack Productions, Inc.*, 71 F.

Supp.2d 846, 853 (N.D. Ill. 1999)). The plaintiff argues that, because the administration agreement

explicitly provides that 100 percent of the "right to administer" the songs at issue is provided to

MHM, McKenna and MHM entered into the restrictive brand of agreement described above.

(Docket No. 51 at 16.)  Therefore, the plaintiff argues, while McKenna may have licensed the

songs at issue to WBR through the Recording Agreement, McKenna "essentially licensed

compositions that she did not control."  (*Id.* at 15.)

In reply, WBR primarily argues that, as of the date of the Recording Agreement and the

September 27, 2005 release of *Bittertown*, MHM was not even a copyright owner of the *Bittertown*

tracks; that is, it was not until the September 29, 2005 Amendment to the ESA that MHM acquired

an ownership interest (50 percent) and administration rights in the songs, and, therefore, it is

18

absurd to argue that Howard, at the time of the Recording Agreement and the *Bittertown* release, had the authority to control how those songs were licensed.  (Docket No. 64 at 5-6.)  This argument is ultimately persuasive.[8]

Indeed, the resolution of this dispute rests in the language of the ESA and the Amendment thereto.  As indicated above, the Amendment to the ESA makes clear that, as of September 29, 2005, MHM is receiving, *for the first time*, ownership rights in the *Bittertown* songs.  (Docket No. 28 Ex. 1 at 16.)  ("*as of this date* [MHM] is herein assigned/transferred one half *of my ownership* in songs embodied on the Warner Bros. album entitled 'Bittertown.'")(emphasis added)

That is, as of the date of the Recording Agreement (August 30, 2005), MHM had no ownership interest in the *Bittertown* songs.  (*Id.*)  Moreover, the provisions of the ESA relied on by the plaintiff do not provide MHM with the authority to control songs that MHM does not yet own.  Indeed, the broader provision (Section 3, repeatedly cited by the plaintiff), in which McKenna grants to MHM "100 % [] interest in all musical compositions" including "all copyrights" and "all administration rights," concerns songs that McKenna would write during the course of the ESA, that is, not the *Bittertown* songs.  (*Id.* at 1.)  Section 4 of the ESA concerns what will happen if MHM "obtain[s] new recordings" of previously recorded McKenna works, including *Bittertown*.  (*Id.* at 2.)  In that event, the ESA provides, McKenna "*will transfer* to [MHM ] one half her

---

[8] It is, therefore, not necessary to address WBR's additional arguments in the Reply.  For instance, WBR contends that, even if MHM held a copyright interest in the songs at the time of the Recording Agreement, the ESA does not *explicitly* provide that MHM is an "exclusive administrator" of the type discussed in the *Kohn* treatise, and, therefore, even following the Amendment, McKenna retained administration rights as well, just as any other copyright owner would.  (*Id.* at 7-9.)  WBR also points to the fact that there is no evidence that, at any time during the 2005 Recording Agreement negotiations, Howard mentioned her alleged exclusive administration rights under the ESA, and, therefore, WBR had no knowledge at the time of the Recording Agreement that McKenna was somehow barred from licensing her music.  (*Id.*)

ownership in the particular song which is newly recorded." (*Id.*)(emphasis added). Also, under Section 4, MHM has the right "to administer 100% of the [] interest in the copyright of said *co-published songs*." (*Id.*) (emphasis added).

The only logical interpretation of this provision is that MHM did not acquire administration rights in the "new recordings" until those recordings were obtained. And, reading the provision as a whole, MHM does not obtain "new recordings," and McKenna and MHM do not become "co-publish[ers]," until McKenna transfers her interest in those songs to MHM. Here, McKenna did not transfer her interest in the *Bittertown* songs until the Amendment to the ESA, which was signed on September 29, 2005. By this point, McKenna, as exclusive owner of the *Bittertown* songs, had already issued licenses to use those songs to WBR. On this interpretation of the Amendment to the ESA, there can be no dispute that, at that time, McKenna was fully within her rights as copyright owner to license those songs. Therefore, the court determines that, as a matter of law, WBR's use of the *Bittertown* songs was pursuant to a valid license from the owner of the songs at that time, and, therefore, MHM's claim of copyright infringement as to those songs is not viable.[9]

_____

[9]As a final point, MHM claims that, irrespective of the ESA, it held copyright ownership in two songs on *Bittertown*, as shown by the fact that, in December 2005, it licensed two Faith Hill recordings of *Bittertown* tracks to WBR. (Docket No. 70 at 2; Docket No. 28 Exs. 2-3.) WBR aptly refers to this argument as a "red herring." (Docket No. 74 at 9.) The issue here is the licensing of McKenna's recordings of McKenna's *Bittertown* songs. As discussed above, as of the date of the Recording Agreement, McKenna had the right to license those songs, as recorded by her.

20

## **CONCLUSION**

For the reasons discussed above, the defendant has a valid defense to the plaintiff's claim of copyright infringement as to all of the songs on the *Bittertown* album and as to five of the songs on the *Unglamorous* album. Issues of fact preclude summary judgment for either party on the defendant's implied license defense as to the remaining *Unglamorous* songs, and, therefore, the plaintiff's copyright infringement case will move forward as to those songs.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge